Michael Joseph **GRANICZNY,** Individually, and as Representative of the Estate Nalan M. Graniczny, and on behalf of all of the heirs at law of Nalan M. Graniczny; and Deanna McSwain, Individually, Plaintiffs,

v.

The **CITY OF EL PASO, TEXAS,** a municipal corporation, et al., Defendants.

No. EP–10–CV–156–PRM.

United States District Court, W.D. Texas, El Paso Division.

March 7, 2011.

William A. Elias, El Paso, TX, for Plaintiffs.

**600**

*ORDER GRANTING DEFENDANTS'*
*MOTION FOR SUMMARY*
*JUDGMENT*

PHILIP R. MARTINEZ, District
Judge.

On this day, the Court considered Defendants Steven Smith and Michael Balderrama's "Motion for Summary Judgment" (Docket No. 30), filed on July 27, 2010 and Defendant Adrian Gonzalez's "Motion for Summary Judgment" (Docket No. 56), filed on September 9, 2010.[1] The Court also considered Michael Joseph Graniczny and Deanna McSwain's (Plaintiffs) "Response to Steven Smith, Michael Balderrama and Adrian Gonzalez' Motions for Summary Judgment" (Docket No. 74) [hereinafter Plaintiffs' Response], filed on November 19, 2010 and Defendants' "Reply to Plaintiffs' Response to Defendants Smith, Balderrama and Gonzalez [sic] Motions for Summary Judgment" (Docket No. 83) [hereinafter Defendants' Reply], filed on December 21, 2010 in the above-captioned cause.

Finally, the Court reviewed Defendants' "Written Objection and Motion to Exclude the Affidavit and Testimony of Dr. Richeson" (Docket No. 81) [hereinafter Defendants' Motion to Exclude Dr. Richeson], filed on December 21, 2010 and Defendants' "Objections to Plaintiffs' Factual Background and Motion to Exclude Evidence Submitted in Plaintiffs' Response to Smith, Balderrama and Gonzalez [sic] Motions for Summary Judgment" (Docket No. 82) [Defendants' Motion to Exclude Evi-

dence], filed on December 21, 2010, along with the responses and replies to each.

After due consideration, the Court is of the opinion that Defendants' Motions for Summary Judgment should be granted for the reasons set forth below.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On April 28, 2010, Plaintiffs Michael Joseph Graniczny—as representative of the estate of Nalan M. Graniczny (Graniczny)—and Deanna McSwain (Plaintiffs) filed their "Complaint and Jury Demand." Docket No. 1. On November 19, 2010, Plaintiffs then filed their "Second Amended Complaint" (Docket No. 72), which acts as the active complaint for the purpose of determining summary judgment.

Plaintiffs claims result from an incident that occurred during an arrest in El Paso County, at approximately 8:00 p.m. on November 5, 2008.[2] That night, 20–year–old Graniczny and another male, Nicholas Meacham (Meacham), were spray painting graffiti on and around private property outside of the El Paso School of Excellence at 1605 George Dieter Drive, when El Paso Police Officer Michael Balderrama (Officer Balderrama) observed them. Second Am. Compl. ¶¶ 14–15; Mot. for Summ. J. Ex. A ¶ 5.

Graniczny and Meacham made their way onto the roof of the school by climbing a pole connected to rooftop satellite dishes. Mot. for Summ. J. Ex. A, ¶ 14; Pls.' Resp. Ex. 13, at 1. Meacham jumped off the roof

---

**1.** Collectively, Defendants Smith, Balderrama, and Gonzalez will be referred to in this Order as "Defendants" or "the Officers." Also, considering that the motions for summary judgment are virtually identical, save for the references to the respective parties, they will hereinafter be referred to as the "Motion for Summary Judgment." For the sake of clarity, citations to the Motion will

refer to Officer Gonzalez's Motion for Summary Judgment unless otherwise noted.

**2.** Plaintiffs' initial Complaint stated that the events occurred on November 6, 2008 but they then filed an "Unopposed Motion for Leave to File Amended Pleading" (Docket No. 58) on September 10, 2010, in part, to correct the date.

safely while Graniczny stayed on. Officer Balderrama, along with Officers Steven Smith (Officer Smith) and Adrian Gonzalez (Officer Gonzalez) then made their way onto the roof to pursue Graniczny. Second Am. Compl. ¶¶ 15–16; Mot. for Summ. J. Ex. A ¶¶ 19–20. Once on the roof, Officer Gonzalez found Graniczny behind an air conditioning unit and notified the other two officers. Second Am. Compl. ¶ 15; Mot. for Summ. J. Ex. A ¶ 21.

Officers Smith and Balderrama searched and physically restrained Graniczny as the Officers waited for an El Paso Fire Department ladder to arrive. Second Am. Compl. ¶ 15; Mot. for Summ. J. Ex. A ¶¶ 21–31. Once the ladder was in place, the Officers removed Graniczny's handcuffs in preparation to descend from the rooftop. Second Am. Compl. ¶ 15; Mot. for Summ. J. Ex. A ¶ 32. Graniczny was standing between Officer Smith—the closest officer in proximity—and the edge of the building. Second Am. Compl. ¶ 15; Mot. for Summ. J. Ex. A ¶ 33. It was then that Graniczny went off the side of the building, and suffered fatal injuries. *Id.*

### A. Disputed Facts

On December 21, 2010, the Officers filed objections to Plaintiffs' factual background and a motion to exclude evidence submitted in Plaintiffs' response to the Motion for Summary Judgment. *See* Mot. to Exclude Evidence. The parties differ in their characterization of the aforementioned events and on a number of details. However, there are only a few differences that are notable for determining summary judgment.

First, the parties disagree on the reason Graniczny decided to climb onto the roof of the building. The Officers, rely on Meacham's deposition, among others, to contend that Graniczny and Meacham "climbed up onto the roof by using a pole for the satellite dishes .... While on the roof, they spray painted their initials in various locations .... When they completed the graffiti and as they were starting to get down, the police were there and they shined a light." Defs.' Mot. to Exclude Evidence ¶ 1. Plaintiffs, however, claim that Officers Smith, Balderrama, and Gonzalez "chased" Graniczny "onto the rooftop ... after Officer Balderrama observed [him] spray[ing] graffiti, or 'tagging', a trashcan." Second Am. Compl. ¶ 15. They alternatively argue that the Officers "did not give Graniczny the opportunity to come off of the roof voluntarily (as Meacham safely did[,] without consequence[,] before the [O]fficers got onto the rooftop), in fact, they did not consider any alternatives to giving chase at all." Pls.' Resp. to Mot. to Exclude ¶ 2.

Second, Plaintiffs claim that, once Graniczny was located, one of the officers struck him with a closed fist at least once. Second Am. Compl. ¶ 15. They also contend that Graniczny may have been handcuffed at the time. Pls.' Resp. ¶ 37. The Officers make no mention of alleged strikes, but do claim that Graniczny was resistant to following their orders—a contention that Plaintiffs do not address. Mot. for Summ. J. Ex. A ¶¶ 21, 25, 27. The Officers claim that Graniczny, in addition to running from them, refused, initially, to sit down when ordered and would not immediately give them one of his hands when they attempted to handcuff him.[3] *Id.* ¶ 27.

Finally, the description of the moments leading up to Graniczny's death also differ. As previously stated, officers of the El Paso Fire Department placed an extension ladder up against the building and the handcuffs were removed from Graniczny.

---

**3.** Plaintiffs claim that Graniczny's hand was caught on a copper pipe beneath him so he could not immediately comply with the order. Second Am. Compl. ¶ 15.

The Officers claim that Graniczny then unexpectedly shoved Officer Smith, "took a few steps across the roof and jumped head first off of the building's rooftop to his death." Mot. for Summ. J. ¶ 2. A number of witnesses claim that the manner that Graniczny went off the side of the roof was odd, explaining that it looked like Graniczny was "doing a belly flop into a swimming pool," without "us[ing] his hands or feet to brace for the impact," and that he went "head first, almost parallel to the ground." *See* Mot. for Summ. J. Ex. C, at 6; Ex. D, at 9; *see also* Defs.' Reply Ex. B, at 22; Ex. C, at 23. Plaintiffs, however, temper the events by claiming that the Officers failed to maintain eye contact with Graniczny who "jumped or fell off the rooftop to his death." Second Am. Compl. ¶ 15.

### B. Claims

Plaintiffs Second Amended Complaint lacks the clarity the Court expects, but therein, Plaintiffs seem to allege that Officers Smith, Balderrama, and Gonzalez violated Graniczny's constitutional rights under the Fourth and Fourteenth Amendments [4] to the U.S. Constitution, allowing them to bring a cause of action pursuant to 42 U.S.C. § 1983 (2006). They also allege that the Officers committed a § 1983 violation of Graniczny's Fourteenth Amendment rights when they knowingly created a dangerous condition that directly led to Graniczny's death,

presumably under the theory of "state-created danger." *Id.* ¶¶ 26, 30.

The Officers claim that they are entitled to summary judgment as a matter of law because they are shielded by qualified immunity against all of Plaintiffs' claims. Mot. for Summ. J. ¶¶ 5, 26.

### C. Challenged Summary Judgment Evidence

To support their claims, Plaintiffs submit an "Appendix of Material in Support of Plaintiffs' Response to [the Officer's] Motion for Summary Judgment." Docket No. 74–1. Among other things, Plaintiffs provide information regarding prior incidents involving Officer Smith, including printouts of local news broadcasts reporting on one such incident. *Id.* Ex. 4. These printouts contain a video link, which Plaintiffs contend is the video taken from Officer Smith's police cruiser on the night he was involved in that particular incident.

Plaintiffs also include an affidavit of Graniczny's childhood psychologist, Dr. Elizabeth Richeson, Ph.D. (Dr. Richeson), in order to show that Graniczny "suffered from ... Attention Deficit Hyperactivity Disorder (ADHD) disorganized type" and as a result, he would more likely than not have "act[ed] in a way to facilitate escape, ... feared additional abuse ... by the police, ... and ... translated [his] impulsivity into a need for escape." Pls.' Resp. ¶ 48. According to Dr. Richeson, Granic-

---

4. While Plaintiffs purport to allege a cause of action under § 1983 for a violation of the Fourteenth Amendment, which grants the right to equal protection under the law, claims under this amendment derive from the denial of medical attention to an arrestee or pretrial detainee. *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1186 (5th Cir.1990) (discussing the Fourteenth Amendment's "guarantee of reasonable medical care and prohibition on punishment of pretrial detainees"). Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures" of the person. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

zny's history of asthma would have also contributed to his "desire to escape." *Id.*

The Officers object to the inclusion of this evidence. They argue that this evidence is not relevant, reliable, or otherwise admissible. Defs.' Mot. to Exclude Evidence ¶ 6; Defs.' Mot. to Exclude Dr. Richeson ¶ 3.

## II. LEGAL STANDARD

### A. Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[5] A genuine dispute of material fact exists only if there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a motion for summary judgment, "[t]he moving party bears the initial burden of showing that there is no genuine issue for trial; it may do so by 'point[ing] out the absence of evidence supporting the nonmoving party's case.'" *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd.*, 40 F.3d 698, 712 (5th Cir.1994) (quoting *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir.1990)). If the moving party has satisfied its initial burden, the non-movant must then come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When a party requests that a court grant its motion for summary judg-

ment, a court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). While a court will resolve factual controversies or disputes in the non-movant's favor, it must do so "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). A court should not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

When the moving party seeks summary judgment on a claim or defense where he does not bear the burden of proof, the moving party "should be able to obtain summary judgment simply by disproving the existence of any essential element of the opposing party's claim or affirmative defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986). On claims where the nonmoving party will bear the burden of proof at trial, it may be unnecessary for the movant to introduce any evidence in order to prevail; rather "the movant can seek summary judgment by establishing that the opposing party has insufficient evidence to prevail as a matter of law, thereby forcing the opposing party to come forward with some evidence or risk having judgment entered against him." 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2727 at 474 (3d ed. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (stating that a motion for summary judgment may be granted in some cases "regardless of

---

**5.** The Court cites to the latest version of Rule 56, rather than to the version in effect at the time the Motion was filed, in order to reflect the most current statement of the law. How-

ever, the Court finds that its ruling on this Motion would be the same under either version of Rule 56.

whether the moving party accompanies its summary judgment motion with affidavits").

## III. ANALYSIS

Before the Court addresses the Plaintiffs' claims and the Officers' arguments, it is necessary to examine the evidence Plaintiffs present in their Response to the Motion for Summary Judgment.

### A. Exclusion of Evidence: Officer Smith's Past Acts

Plaintiffs claim that four eyewitness saw an officer strike Graniczny at least once. Pls.' Resp. to Mot. to Exclude ¶ 1. However, all three of the Officers deny striking Graniczny. App. in Support of Mot. for Summ. J. (Docket No. 32) Ex. D–1, at 5. Plaintiffs wish to introduce evidence of Officer Smith's disciplinary history and printouts of news broadcasts of a particular incident that occurred during an arrest, in an attempt to tie Officer Smith to the alleged striking. Pls.' Resp. ¶¶ 20–21. The Officers object to the inclusion of this evidence as being inadmissible propensity character evidence and inadmissible hearsay. Defs.' Mot. to Exclude ¶¶ 6, 7. Plaintiffs counter that the disciplinary history "proves [that Officer Smith] has a habit of abusing citizens of El Paso under color of authority (especially when he perceives them to be evading arrest) and is admissible for that purpose" under Federal Rule of Evidence 406.[6] Pls.' Resp. to Mot. to Exclude ¶ 4. Plaintiffs also claim that the disciplinary history is admissible for "other purposes" under Federal Rule of Evidence 404(b).[7] Id. ¶ 6.

The Court notes with disfavor that Plaintiffs rely on a shotgun approach to the Federal Rules of Evidence. They point to a number of rules and exceptions without describing how they apply to the facts of the case, seemingly in an attempt to stumble upon one that may have a favorable result. Still, the Court has carefully reviewed the arguments and applicable law and finds that Officer Smith's disciplinary history and the printouts of the news broadcast are inadmissible.

#### 1. Habit Evidence

Rule 406's use of the term "habit" suggests a "regular response to a repeated specific situation" that has become "semi-automatic." *Leonard v. Nationwide Mut. Ins., Co.*, 499 F.3d 419, 442 (5th Cir.2007) (citing *Pursley v. Dretke*, 114 Fed.Appx. 630, 634 (5th Cir.2004) ("habit" means "a specific reaction to a specific set of stimuli that is reflexive, repeated, and invariable in nature.")); *United States v. West*, 22 F.3d 586, 592 (5th Cir.1994) (rejecting Rule 406 argument because the offered evidence was not numerous enough in relation to thousands of other dealings of defendant). In *Leonard*, the defendant was an insurance agent with about fifteen hun-

---

6. Rule 406 provides:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Fed R. Evid. 406.

7. Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

dred customers. *Leonard,* 499 F.3d at 442. The Fifth Circuit found that comments he purportedly made to five of them, over the course of a decade, about the need for additional flood coverage did not "remotely qualify or quantify as a habit within the meaning the Rule 406." *Id.*

■ In this case, Plaintiffs allege that three prior incidents involving Officer Smith constitute a "habit" under Rule 406. Plaintiffs specify that Officer Smith's habit is accentuated while he is making arrests. Pls.' Resp. to Mot. to Exclude ¶ 4. The Officers, on the other hand, provide evidence that Officer Smith issued 14,624 traffic citations over a five-year period. Defs.' Mot. to Exclude Ex. 1, at 1. While not particularly representative of the number of arrests Officer Smith has made, the number of citations is indicative of the numerous occasions during which Officer Smith interacted with the citizens of El Paso. Accordingly, the Court is not convinced that three alleged incidents over a similar period of time demonstrate an invariable, reflexive response on the part of Officer Smith.

### 2. Character Evidence

Extrinsic offense evidence is never admissible to show that a defendant has a bad character or propensity to commit the act in issue, although it may be admissible for some other relevant purpose. FED. R.EVID. 404(b); *see also United States v. Escobar,* 674 F.2d 469, 474 (5th Cir.1982). For example, it may admissible for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED.R.EVID. 404(b).

■ In assessing the admissibility of evidence under Rule 404(b), the Court must determine whether: (1) the extrinsic-offense evidence is relevant to an issue other than Officer Smith's character; and (2) the probative value of the evidence is *not* substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See United States v. Hernandez–Guevara,* 162 F.3d 863, 870 (5th Cir.1998) (citing *United States v. Beechum,* 582 F.2d 898, 911 (5th Cir.1978) (en banc)).

■ First, Plaintiffs claim that the disciplinary history is relevant to prove that "the identity of the officer on the roof who struck ... Graniczny was [Officer] Smith." Pls.' Resp. to Mot. to Exclude ¶ 6. However, the "identity" basis requires a showing that the present act and past act share distinctive characteristics that evince a "signature quality." *United States v. Sanchez,* 988 F.2d 1384, 1393 (5th Cir. 1993). The degree of similarity must be substantial, yet Plaintiffs here do not describe any "signature quality" to the alleged actions of Officer Smith.

In addition, Plaintiffs allege that the disciplinary history is admissible to prove: that Officer Smith's alleged physical and verbal abuse of Graniczny was not an accident or mistake; that Officer Smith had knowledge that he could " 'get away with' " physically and verbally abusing citizens without losing his job; and that Officer Smith had an opportunity to act out his aggressions as a result of his position of authority. Pls.' Resp. to Mot. to Exclude ¶ 6. Plaintiffs provide no bases for these arguments, so the Court is reluctant to entertain the conclusions, but what is evident is that, while Plaintiffs couch their arguments in purposes other than "character," this is precisely what they are attempting to show.

Officer Smith has not alleged that he mistakenly or accidently struck Graniczny, so evidence to refute such an assertion is irrelevant. Further, Plaintiffs' "knowledge" and "opportunity" bases are generalized conclusions of low probative value. The closer the extrinsic offense resembles

the present alleged offense, the greater the prejudice to the defendant. *See United States v. Waldrip*, 981 F.2d 799, 803 (5th Cir.1993) (describing how similarities of past acts contributes to unfair prejudice). There is a high likelihood that a jury would decide that Officer Smith is the kind of person who commits this particular type of offense just because of his history. *Id.*

Accordingly, even if this evidence was admissible under Rule 404(b), its admission violates Federal Rule of Evidence 403 [8] because its probative value is substantially outweighed by the danger of unfair prejudice. FED.R.EVID. 403; *Beechum*, 582 F.2d at 911.

### 3. Impeachment

■ Plaintiffs also contend that the disciplinary history may be used to impeach Officer Smith under Rule 608(b). This view, however, is misguided.

A district court may, under Rule 608(b) [9] , determine if evidence is probative of *truthfulness*, and under Rule 403 exclude even probative evidence if the prejudicial effect substantially outweighs the probative value. *United States v. Farias–Farias*, 925 F.2d 805, 809 (5th Cir.1991). In this case, Officer Smith's prior acts are not probative of his character for truthfulness or untruthfulness. As such, they are inadmissible for this purpose.

### 4. News Printouts

The Officers argue that the printouts of news broadcasts are inadmissible hearsay while Plaintiffs contend that there are no hearsay problems, and if there are, a number of hearsay exceptions are applicable. Defs.' Mot. to Exclude ¶ 7; Pls.' Resp. to Mot. to Exclude ¶ 8. To determine admissibility though, the printouts must be viewed as containing two types of evidence: a written article and a video link.

The Fifth Circuit has expressly found that newspaper articles are "classic, inadmissible hearsay." *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005). Plaintiffs, however, cite *Jauch v. Corley*, 830 F.2d 47, 52 (5th Cir.1987), for the proposition that newspaper articles and videos are admissible if they are not offered to prove the truth of the matter asserted. Pls.' Resp. to Mot. to Exclude ¶ 8. However, in *Jauch*, there was an issue regarding vicarious liability in a defamation suit and the newspaper articles and video presented as evidence were allowed because they contained the defamatory statements. *Id.* In this case, Plaintiffs claim that the articles and video are also not being offered to "establish the truth of the matters being screamed by [O]fficer [Smith]," but do not state what they are offering it to show.

Further, Plaintiffs state that the video itself is admissible under a number of hearsay exceptions, namely: Federal Rules of Evidence 803(1), 803(2), 803(3), 803(5), 803(6) and 803(8). However, Plaintiffs again fail to state how any of these exceptions apply. While, the Court de-

---

8. Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R.EVID. 403.

9. Rule 608(b) provides in relevant part that: [s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative or truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness,

. . . .

FED.R.EVID. 608(b).

clines to guess what these arguments may be, it concludes that, regardless of the potential arguments, the articles and video suffer from many of the evidentiary deficiencies already mentioned in analyzing the admissibility of Officer Smith's prior disciplinary history. Plaintiffs wish to use the evidence to augment Officer Smith's disciplinary history, but the Court, as previously discussed, finds that the disciplinary history is inadmissible.

Plaintiffs' final contention on this point, that the video establishes that Officer Smith has a "habit" of saying that arrestees "would not give him their hands," is equally unpersuasive. A single example, over the course of a career, does not demonstrate an invariable, reflexive response on the part of Officer Smith.

## B. Exclusion of Evidence: Affidavit and Testimony of Dr. Richeson

Plaintiffs also seek to admit an affidavit and testimony of Dr. Richeson to show that Graniczny suffered from ADHD and asthma, and how these conditions affected Graniczny's mental state on the night of the incident. Pls.' Resp. to Mot. to Exclude Dr. Richeson ¶¶ 1–11. The Officers contend that the testimony is irrelevant to the issues of the case and unreliable due to what they perceive as deficiencies with Dr. Richeson's analysis. Defs.' Mot. to Exclude Dr. Richeson ¶ 3.

The Court finds that Dr. Richeson's testimony and affidavit do not pertain to the issues presently before the Court and are therefore inadmissible.

### 1. Admissibility of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony and provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, ified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED.R.EVID. 702.

A district court must make a preliminary inquiry into whether proposed expert testimony sufficiently meets the requirements of Rule 702. *Vargas v. Lee,* 317 F.3d 498, 500 (5th Cir.2003) (citations omitted). In doing so, the district court acts as a "gate-keeper" of expert witness testimony, and this "gate-keeping obligation applies to all types of expert testimony." *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 244 (5th Cir.2002) (citation omitted).

Under Rule 702, expert testimony must "assist the trier of fact to understand the evidence or determine a fact in issue." FED.R.EVID. 702; *Bocanegra v. Vicmar Servs.,* 320 F.3d 581, 584 (5th Cir.2003). That is, expert testimony must be relevant. Relevant evidence is evidence "which has 'any tendency to make any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Mathis v. Exxon Corp.,* 302 F.3d 448, 460 (5th Cir.2002) (citing FED.R.EVID. 401). Stated differently, admissibility of expert testimony depends, in part, upon the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case. *Texas A & M Research Found. v. Magna Transp., Inc.,* 338 F.3d 394, 403 (5th Cir. 2003) (referencing Federal Rule of Evidence 701).

In this case, the relevant issues are whether the Officers are entitled to qualified immunity and whether Plaintiffs' claims for excessive force and "state creat-

ed danger" fail as a matter of law. Since experts only can opine regarding issues of fact, only the qualified immunity issues remain. FED.R.EVID. 702.

■ Plaintiffs argue that Dr. Richeson's testimony "is directly relevant to the issue of qualified immunity because it proves that the [O]fficer's conduct in striking ... Graniczny ... was the proximate cause of [his] attempted escape and death." Pls.' Resp. to Mot. to Exclude Dr. Richeson ¶ 2. Qualified immunity turns only upon the objective reasonableness of the defendant's acts. *Thompson v. Upshur Cnty.*, 245 F.3d 447, 457 (5th Cir.2001) (citing *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir.1997)). Even a particular defendant's subjective state of mind has no bearing on whether that defendant is entitled to qualified immunity. *Id.*

■ Dr. Richeson states that she is unable to opine on any matter relating to the Officers' perspective, their state of mind, what clues they would look for in determining "impulsivity," or "any facet of how [the Officers] ... should have known that [Graniczny] was going to [have] this extreme reaction." Defs.' Mot. to Exclude Dr. Richeson Ex. A, at 74, 77, 94. This means that Dr. Richeson is unable to provide a trier of fact with assistance to determine a fact in *issue*. Additionally, the Court fails to see how Graniczny's subjective state of mind is relevant to qualified immunity if there is no evidence that the Officers suspected that Graniczny had ADHD and asthma, and, even if they did,

there is no authority showing that an objectively reasonable police officer would have treated a person with these conditions any differently.

Since the Court finds that Dr. Richeson's testimony is irrelevant, it does not have to proceed to analyze its reliability. Accordingly, the Officers' Motion to Exclude Dr. Richeson is granted. Having established certain evidentiary parameters, the Court proceeds in the determination of the Summary Judgment Motion.

## C. Qualified Immunity

The doctrine of qualified immunity provides immunity from suit under § 1983 to government officials provided that "their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." [10] *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir.2009) (quoting *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir.2005)); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("The entitlement [to qualified immunity] is an immunity from suit rather than a mere defense to liability ....").

The Court therefore first asks whether, taking the facts in the light most favorable to the plaintiff, the Officer's alleged conduct violated a constitutional right. *Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir.2009) (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). If the Court determines that the alleged conduct did not violate a constitutional right, the inquiry ceases because there is no constitutional violation

---

**10.** The Supreme Court recently reconsidered and made non-mandatory its previous requirement that courts always evaluate whether the conduct, as shown at summary judgment, in fact violated a constitutional right *before* evaluating whether the right at issue was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172

L.Ed.2d 565 (2009) (limiting *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). As the Fifth Circuit later noted, *Pearson* regarded the *Saucier* methodology as "often beneficial." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir.2009); *see also Pearson*, 129 S.Ct. at 818.

for which the government official would need qualified immunity. *Id.* If, however, the alleged conduct amounts to a constitutional violation, then the Court must ask the whether the right was clearly established at the time of the conduct. *Id.* Qualified immunity allows for officers to make reasonable mistakes about whether their conduct violates the law, and an officer's mistake is reasonable when there are insufficient indicia that the conduct in question was illegal. *Freeman v. Gore,* 483 F.3d 404, 416 (5th Cir.2007). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. If the Court answers both questions affirmatively, the officer is not entitled to qualified immunity.

Thus, the Court, in this case, must determine: (1) whether the Officers' alleged conduct violated Graniczny's constitutional rights, and if so, (2) whether those rights were clearly established at the time of the incident.

### 1. Application

■ As a preliminary matter, the Court finds that the Officers had probable cause to believe that a criminal offense had been or was being committed. "Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. McCowan,* 469 F.3d 386, 390 (5th Cir.2006). A mistake reasonably made as to probable cause justifies qualified immunity. *Tarver v. City of Edna,* 410 F.3d 745, 750 (5th Cir.2005). There was probable cause to arrest and subsequently search Graniczny based on his actions that night and on the Officers' reasonable belief that he was engaged in spray painting private property without permission, trespassing, and evading arrest. Plaintiffs assert, however, that the Officers used excessive force on Graniczny during the arrest, implicating his Fourth Amendment right to be free from an unreasonable seizure.

### a. Use of Force

The Fourth Amendment requires that a seizure be objectively reasonable, *see Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865. Whether Graniczny's rights were violated within the meaning of the Fourth Amendment, however, depends on what "force" is being alleged. Plaintiffs claim that Graniczny was struck at least once, but attempt to connect this disputed action to his eventual death; the inclusion of the definition of "deadly force" in their Response indicates the conflation of these two actions. This strategy, while beneficial to their case (because Graniczny's actions arguably did not warrant deadly force) is unfounded. The Court acknowledges that Plaintiffs' allegations must be accepted as true at this stage, but only if supported by evidence. *Little,* 37 F.3d at 1075.

Plaintiffs do, however, provide testimony from eyewitnesses describing at least one strike with a closed fist, but the link between the alleged strike(s) and the death is tenuous at best. There is no evidence that the Officers forced Graniczny off of the roof or that Graniczny stumbled off accidently due to the Officers' lack of due care. The evidence, provided from a number of individuals, describes volition on the part of Graniczny to jump off the roof. The manner in which he ran off of the roof and the contortion of his body suggest an unexpected decision on the part of Graniczny.

■ Even if the Court were to draw a connection between those two events, it must focus on the force the Officers actual-

ly used, not just on the ultimate consequence. This case demonstrates *at most* that Graniczny reacted in a unique way to the events. The Officers "cannot be held responsible for the unexpected, albeit tragic result, of their use of necessary force." *Hill v. Carroll Cnty.*, 587 F.3d 230, 237 (5th Cir.2009). Plaintiffs' desire to link the Officers's use of force to Graniczny's death is just the sort of hindsight review that qualified immunity was meant to guard against.

### b. Excessive Force

To prevail on an excessive force claim, a plaintiff must show "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Ontiveros*, 564 F.3d at 382 (quoting *Freeman*, 483 F.3d at 416). "[A]n injury is generally legally cognizable when it results from a degree of force that is constitutionally impermissible—that is, objectively unreasonable under the circumstances." *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir.2008). "The objective reasonableness of the force, in turn, depends on the facts and circumstances of the particular case, such that the need for force determines how much force is constitutionally permissible." *Id.* The test for reasonableness must consider "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Thus, this analysis encompasses the two prongs of the qualified immunity analysis previously mentioned: whether there was a violation of a constitutional right and whether that right was clearly established at the time of the alleged action.

Presumably, Plaintiffs wish to show that Graniczny's injury was his death, and that it resulted "directly and only" from the Officers' clearly excessive and unreasonable use of force. As discussed, the link between the Officer's alleged action and Graniczny's death is tenuous, and it would be difficult to say that it resulted "directly and only" from the force. Even if there was a direct link, the use would have be shown to be unreasonable given the circumstances.

Assessing the reasonableness of a police officer's use of force involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, (quoting *Garner*, 471 U.S. at 8, 105 S.Ct. 1694). A court analyzes the reasonableness of an officer's conduct "objectively," that is, without reference to the subjective intent or motivation that underlies the officer's conduct. *Id.* at 397, 109 S.Ct. 1865. A court must also look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. 1865. It must also account for the difficult and often split-second decisions that police officers must make in carrying out their duties. *Id.* at 396–97, 109 S.Ct. 1865.

There are few, if any, bright lines for judging a police officer's use of force; when determining whether an officer's conduct violated the Fourth Amendment, "we must ... slosh our way through the fact bound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383, 127 S.Ct. 1769 (rejecting "an easy-to-apply legal test in the Fourth Amendment context").

■■■■ At the summary judgment stage, once a court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [a police officer's] actions ... is a pure question of law." *Id.* at

381 & n. 8, 127 S.Ct. 1769. When facts are disputed and "significant factual gaps remain that require the court to draw several plaintiff-favorable inferences, [a court's] analysis is more tentative." *Lytle,* 560 F.3d at 412. In these cases, a Court must consider what a fact finder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the plaintiff. *Id.*

What this means for the present case is that the Court can only find "no constitutional violation" if, even under the version of the facts most favorable to Plaintiffs, the Officers' conduct was objectively reasonable. In such a case, no rational jury could conclude that the Officers violated the Fourth Amendment, and any genuinely disputed fact issues would be thus immaterial because their resolution would not alter the ultimate conclusion. But if a fact finder could conclude that the Officers violated the Constitution, the Court must then analyze whether those rights were clearly established at the time of the incident.

 The Officers assert that they did not strike Graniczny. If the facts were as the Officers allege—that is, that they "escorted him to a sitting position" and used their knees on Graniczny's back to handcuff him—they would likely be entitled to qualified immunity. Mot. for Summ. J. Ex. A ¶ 25–26. This is due to Graniczny's alleged failure to comply with the Officers' orders. As previously mentioned, however, the Plaintiffs differ on certain facts.

The Officers contend: (1) that two males, Graniczny and Meacham, had tagged, and were tagging, the area on and around the School of Excellence; (2) that the two males had climbed onto the roof of the School of Excellence, thereby trespassing; (3) that the males evaded and "yelled a cuss word" at the Officers after they were told to stop; (4) that Meacham came off the roof and was apprehended; (5) that Graniczny was still on the roof, hiding behind an air conditioning unit, when he was discovered; (6) that Graniczny had tagged the air conditioning unit; (7) that Graniczny "began to walk away" after Officer Smith ordered him to place his hands on the air conditioner so that Graniczny could be searched; (8) that Graniczny "appeared like he was going to start to walk away again" so Officer Smith ordered Graniczny to sit down; (9) that Graniczny "became irritated" and refused to sit down; (10) that Officer Smith had to force Graniczny into the sitting position; (11) that Graniczny "would not place his right hand behind his back" when Officer Smith wanted to handcuff him, (12) that Officer Smith attempted to secure the right arm "numerous times" and had to be assisted by Officer Gonzalez to handcuff Graniczny; and finally (13) that Graniczny questioned them regarding possible jail time. *Id.* ¶¶ 7–27.

Plaintiffs seemingly object to every instance of force used by the Officers in getting Graniczny to comply with their orders. They particularly argue that the reason Graniczny would not provide his hand in order to be handcuffed was because it was caught on a copper pipe. Second Am. Compl. ¶ 1. They also suggest that there are at least genuine issues of material fact as to whether Graniczny was struck with a closed fist, whether Graniczny was handcuffed at the time he was struck, which of the police officers allegedly struck him, and "whether all three police offices are covering up the truth." Pls.' Resp. ¶ 37.

First, whether Graniczny's hand was *actually* caught on a pipe is immaterial if the Officers reasonably believed that Graniczny was resisting at the time of the command, and there is no evidence to show that the Officers knew otherwise at the time of the command. Next, Plaintiffs

have provides no evidence to show that the Officers are "covering up the truth." Thus, the only issue that remains for this claim is whether Graniczny was struck and if he was handcuffed when he was allegedly struck and whether these actions were reasonable in light of the circumstances.

Plaintiffs' own Second Amended Complaint states "[a]t this point, instead of handcuffing ... Graniczny ... while he and the [O]fficers were standing, one of the [Officers] struck ... Graniczny in the face with a closed fist ... handcuffed him; and made him lay face down with his hands behind his back on the ground, until the [Officers] were ready to remove him from the rooftop." Second Am. Comp. ¶ 15. However, in Plaintiffs' Response filed the same day as the Second Amended Complaint, Plaintiffs claim that it is a genuine issue of material fact whether Graniczny was handcuffed at the time he was allegedly struck. Pls.' Resp. ¶ 37. They simply quote four witnesses who viewed the events together and who describe varied versions of whether or not Graniczny was handcuffed when allegedly struck. The first listed witness states "[b]y this time[,] [Graniczny] was handcuffed because he had his hands behind his back as he sat there." The second one states "I believe the police officer then handcuffed the kid," while the third one states "I could not tell if the individual was handcuffed." *Id.* ¶ 36. The last listed witness states "it appeared that they had him handcuffed." *Id.* Plaintiffs make no effort to explain the inconsistency between their Second Amended Complaint and their Response. The Court again notes with disfavor the manner in which Plaintiffs have presented their pleadings. Whether Graniczny was handcuffed when allegedly struck is an important point for the Court to consider.

The Officers, on the other hand, provide evidence from a civilian witness standing at a different vantage point. This witness explains that the Officers were trying to apprehend Graniczny while on the roof and were ordering him to "get down," a "few times." Defs.' Reply Ex. B, at 15. Graniczny was "running" from them "[a]nd when they told him to stop, he wouldn't stop." *Id.* He also states that "[Graniczny] wouldn't get down, so they put him down and put his handcuffs on him." *Id.* When asked if the Officers struck Graniczny, he also stated, "No, sir." *Id.* at 17 (when asked if Graniczny was struck while on the floor handcuffed), 21 (when asked if Graniczny was struck while standing once the handcuffs were removed).

The Court is of the opinion that the Officers are allowed reasonable discretion for their actions even under Plaintiffs' version of the events. *Scott v. Harris*, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (internal quotations and citation omitted). The evidence provided paints a picture of a quickly evolving scene replete with unknown variables. Notably, the entire incident took place in about 24 minutes.[11] Defs.' Reply Ex. D ¶ 41. There were lights in the adjoining alley, but the roof was relatively

---

**11.** The time line is described as follows:

| | |
|---|---|
| 20:01:27 | Initial radio request by Officer Balderrama for assistance |
| 20:06:43 | Area perimeter set "north alley way block exit" |
| 20:07:43 | Officers provide description of suspects "w/m bl jeans/blu sweat shirt" |
| 20:07:59 | Dispatcher requests ladder for [suspects] on the roof |
| 20:08:38 | Request linked to Fire Department |
| 20:13:31 | Fire truck dispatched to scene |
| 20:19:02 | Officers report "all subj in custody" |
| 20:24:17 | Officers request medical assistance |

Defs.' Reply Ex. D ¶ 41.

dark. *Id.* Ex. B, at 12. Also, because the situation unfolded near the edge of the roof, the scene was additionally precarious. While Graniczny has been described as verbally compliant, he was also physically resistant to the Officers' commands and could reasonably have been thought to be evading. This, combined with his physical size (described as 5'10" in height and 241 pounds), Mot. for Summ. J. Ex. D–2 (Medical Records), made the apprehension more difficult. Still, the Officers provided Graniczny with ample opportunity to cease his evasion and he refused to do so. The situation on the roof in question on the night of November 5, 2008, thus, is exemplary of a tense, uncertain, and rapidly evolving situation—one that required the Officers to make split-second judgments, which the doctrine of qualified immunity is designed to protect. *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir.1994) (internal citations and quotations omitted).

Although there is no doubt that Graniczny has a Fourth Amendment right to be free from unreasonable search and seizure, the Court cannot find—even when considered in the light most favorable to Plaintiffs—that the Officers were objectively unreasonable under the second prong of the qualified immunity analysis.

### D. State Created Danger

██ In order to establish the existence of a constitutional violation in this case, Plaintiffs also urge that the Court accept the state-created danger theory. The state-created danger theory derives from the Fourteenth Amendment's substantive due process right to be free from state deprivation of "bodily integrity liberty interest." *Rios v. City of Del Rio*, 444 F.3d 417, 422–23 (5th Cir.2006). In *DeShaney v. Winnebago Cnty.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court held that "[a]s a general matter ... a State's failure to protect an individual against private violence simply

does not constitute a violation of the Due Process Clause," but recognized an exception respecting individuals in certain "special relationships" with the state. *Id.* at 197, 109 S.Ct. 998. The state-created danger theory is a purported exception to *DeShaney*. *Rios*, 444 F.3d at 422. It can be found when (1) a state created or increased the danger to the plaintiffs and (2) acted with deliberate indifference to the safety of the plaintiff. *Id.* at 422–23. There are a number of problems with advocating for the application of this theory in the context of the instant case.

██ The Fifth Circuit has discussed state-created danger a number of times but has never adopted it. *Rios*, 444 F.3d at 422–23 ("[N]either the Supreme Court nor this court has ever either adopted the state-created danger theory or sustained a recovery on the basis thereof. We have, however, many times refused to allow recovery sought to be predicated thereunder."); *see also Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir.2004) ("This court has consistently refused to recognize a 'state-created danger' theory of § 1983 liability"); *Morin v. Moore*, 309 F.3d 316, 321–24 (5th Cir.2002); *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 313–14 (5th Cir.2002).

Plaintiffs insist that the theory was adopted by the Fifth Circuit, but a simple review of the case law reveals that this assertion is incorrect. Plaintiffs contend that "[t]he Fifth Circuit ... adopted the state created danger theory in *Scanlan v. Texas A & M University*, 343 F.3d 533 (5th Cir.2003)." Pls.' Resp. ¶ 41. However, the Fifth Circuit in *Rios* expressly stated that "*nowhere* in the [*Scanlan*] opinion does the [Fifth Circuit] expressly purport to adopt or approve that theory. At least two subsequent panels have construed *Scanlan* as not adopting the state-created danger theory." *Rios*, 444 F.3d at

423. Plaintiffs then state that "[t]he Fifth Circuit reiterated its adoption of the state created danger theory in the companion case of *Breen v. Texas A & M University*, 485 F.3d 325, 335–36 (5th Cir.2007)." Pls.' Resp. ¶ 42. While initially true, three months after *Breen*, the Fifth Circuit held a rehearing and decided that "Section III. A, including its subsections 1 through 3, of the panel opinion, found at 485 F.3d 325, 332–38 (5th Cir.2007), along with footnote 14, is hereby withdrawn and deleted from the opinion." *Breen v. Texas A & M University*, 494 F.3d 516, 518 (5th Cir. 2007). This deletion encompasses the entirety of the citation on which Plaintiffs rely. Since the theory has not been adopted, there is no way for the Officers to have been on notice of this right and "their conduct [could] not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Goodman*, 571 F.3d at 395.

■ Even if a state-created danger theory were acknowledged in this circuit, in order for the Officers to be held liable, Plaintiffs must show that the Officers created or increased the danger and then acted with "deliberate indifference" to Graniczny's safety. *See Beltran*, 367 F.3d. at 307 (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir.2002); *Scanlan*, 343 F.3d at 537–38). Deliberate indifference requires that the state actor both knew of and disregarded an excessive risk to the victim's health and safety. *McClendon*, 305 F.3d at 326, n. 8. After a review of the record, the Court finds that the Officers would not be liable under a state-created danger theory even if adopted.

■ First, contrary to Plaintiffs' assertion that the Officers "chased" Graniczny and Meacham onto the roof, Meacham's own testimony shows that the two men were already on the roof when the Officers arrived. Defs.' Mot. to Exclude Evidence ¶ 1. Plaintiffs then argue that the Officers did not consider any alternative to giving chase. Pls.' Resp. to Mot. to Exclude ¶ 2. Plaintiffs have not offered evidence on what may or may not have been a part of the Officers' decision-making process and considering the quick sequence of the events, it is hardly necessary for the Officers to run through an extensive list of possible alternative actions as long as their ultimate decision was reasonable.

Next, Plaintiffs argue that the decision to use a ladder, "instead of other safer means ... placed [Graniczny] in a position of danger that [he] would not have otherwise faced." Second Am. Compl. ¶ 18. The Court finds a number of problems with this conclusion, most notably, the objection to the use of the ladder. Jorge V. Cortez, a 16–year veteran firefighter and captain at the El Paso Fire Department, offered testimony regarding the process of determining which ladder to use that night. Captain Cortez explains that the sizes of the ladders, combined with the low roof-line and the narrowness of the alley, precluded the use of many of the longer ladders. Defs.' Reply Ex. C., at 7. He also explains that, contrary to Plaintiffs' argument that an aerial basket would have been safer, an aerial basket is used primarily for firefighting and he has never heard of a situation where an aerial basket has been used for any type of rescue. *Id.* Ex. C., at 10. Additionally, there were no rooftop elevators or stairs. Taken together, the Court cannot find that the Officers increased the danger to Graniczny or were deliberately indifferent in their decision to use a ladder.

Plaintiffs also claim that the Officers' actions in apprehending Graniczny while on the roof and in preparing him for removal from the roof created or increased a dangerous situation. As previously discussed, the Court does not find that the

Officers' actions in apprehending Graniczny were unreasonable given the circumstances. In addition, evidence shows that Graniczny was given instructions that his handcuffs would be removed, that he was to stand up and that he was going to be walked over to the ladder and that "he was not … to try anything stupid," to which he replied, "Yes sir, I won't." Mot. for Summ. J. Ex. C., at 5–6. Plaintiffs assertion that the Officers did not maintain eye or physical contact with Graniczny is not supported by the record and even if it was, is immaterial for the sake of determining liability under the state-created danger theory.

Finally, Plaintiffs suggest that Graniczny had mental and physical conditions that may have affected his behavior. Second Am. Compl. ¶ 15, 20. They also contend that the Officers should have known that Graniczny "may act irrationally, because of the treatment he received." *Id.* at 20. However, the Officer's "liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Hare v. City of Corinth,* 74 F.3d 633, 650 (5th Cir.1996) (en banc). "[T]he correct legal standard is not whether the … officers 'knew or should have known,' but whether they had gained actual knowledge of the substantial risk of [serious harm] and responded with deliberate indifference." *Id.* There is nothing in the record to suggest that the Officers had actual knowledge that Graniczny had physical or mental conditions that would affect his decision-making abilities, and thus the Officer could have no way of being deliberately indifferent to these conditions.

After due consideration, the Court is of the opinion that, even if the Fifth Circuit had adopted the state-created danger theory, the Officers were not deliberately indifferent in violation of Graniczny's Fourteenth Amendment rights. Consequently, the Officers are entitled to summary judgement on this claim as well.

## IV. CONCLUSION

Given the record, the Court finds that the Officers' actions did not violate Graniczny's constitutional rights. As such, the Officers are entitled to qualified immunity and Defendants' Motion for Summary Judgment should be granted.

Accordingly, **IT IS ORDERED** that Defendants' "Written Objection and Motion to Exclude the Affidavit and Testimony of Dr. Richeson" (Docket No. 81) and Defendants' "Objections to Plaintiffs' Factual Background and Motion to Exclude Evidence Submitted in Plaintiffs' Response to Smith, Balderrama and Gonzalez [sic] Motions for Summary Judgment" (Docket No. 82) are **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants Steven Smith and Michael Balderrama's "Motion for Summary Judgment" (Docket No. 30) and Defendant Adrian Gonzalez's "Motion for Summary Judgment" (Docket No. 56) are **GRANTED.**

**IT IS FURTHER ORDERED** that above-captioned cause is **DISMISSED WITH PREJUDICE** as to Defendants Steven Smith, Michael Balderrama, and Adrian Gonzalez.